## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOHN D. DARER, 4STRUCTURES.COM, LLC** : | **CASE NO. 302 CV 1751 (MRK)** |
| **d/b/a SUMMIT SETTLEMENT SERVICES,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| : | |
| **v.** : | |
| : | **EXHIBIT E** |
| : | |
| **MARY WROBLESKI and LING WANG,** : | |
| : | |
| : | |
| **Defendants.** : | |

## DEFENDANT MARY WROBLESKI'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Mary Wrobleski respectfully submits the following proposed findings of fact and conclusions of law.  With respect to all of the foregoing "findings of fact," Ms. Wrobleski will rely primarily upon her trial testimony.  When principal reliance also will be made on other testimony or exhibits, it is so noted.  Nonetheless, Ms. Wrobleski believes that much of the testimony and exhibits introduced by the Plaintiffs supports her position, and she therefore designates the source of her primary reliance without prejudice to her reliance on such other testimony and exhibits.

## FIRST COUNT - COPYRIGHT INFRINGEMENT AS TO WROBLESKI

FINDINGS OF FACT:

1.      There is no proof that Ms. Wrobleski copied, distributed, disseminated, disclosed and/or otherwise reproduced unauthorized copies of any copyrighted material owned by the Plaintiffs.

2.      There is no proof that Ms. Wrobleski marketed or attempted to sell unauthorized copies of any copyrighted material owned by the Plaintiffs.

3.      Much of the information, business plans and other matter they claim as their

proprietary intellectual property was copied from other businesses and websites in the public domain.  Thus, it does not constitute the Plaintiffs' original work product capable of copyright protection.

4.      There is no proof that Ms. Wrobleski wilfully infringed any copyrighted material owned by the Plaintiffs.

5.      There is no proof that the Plaintiffs have suffered <u>any</u> loss or damages resulting from Ms Wrobleski's alleged infringement of their copyrighted materials.  (Darer Testimony.)

6.      Ms. Wrobleski did not disclose any copyrighted material to Viren Patel.  (Viren Patel deposition and/or testimony).

7.      Ms. Wrobleski did not show any source code to Viren Patel.  (Viren Patel deposition and/or testimony).

8.      Ms. Wrobleski did not publicly perform or publicly display any copyrighted material owned by the Plaintiffs.

9.      Ms. Wrobleski did not disseminate any copyrighted material owned by the Plaintiffs.

10.     Since prior to the time this action was commenced, Ms. Wrobleski no longer had in her possession any copyrighted material owned by the Plaintiffs.  To the extent copyrighted material existed on Ms. Wrobleski's home computer or otherwise in her possession, she deleted that software off of her home computer after demand for return of the Plaintiffs' property was made, prior to the commencement of this litigation.

11.     Since prior to the time this action was commenced, Ms. Wrobleski, individually and through counsel, has expressed her abandonment of any claim to ownership of the software she wrote and/or designed for the Plaintiffs.  Likewise, since prior to the time this action was commenced, Ms. Wrobleski has not threatened to copy or sell any software or other items that the Plaintiffs claim to be the subject of their copyright protect.

12.     The Plaintiffs were motivated to bring this copyright claim by a desire to punish

Ms. Wrobleski by forcing her to incur extensive attorney's fees in the hopes of financially harming her.  (Darer Testimony, Wang Testimony).

13.    The Plaintiffs' copyright claim is factually unsupported.

14.    The Plaintiffs have attempted to stifle competition by prosecuting meritless claims of copyright infringement.  (Darer Testimony, Wang Testimony, Sybits complaint).

CONCLUSIONS OF LAW:

1.    In the First Count, the Plaintiffs allege that Ms. Wrobleski "copied, distributed, disseminated, disclosed and/or otherwise reproduced unauthorized copies of the Intellectual Property." See Amended Verified Complaint ¶ 116.  The Plaintiffs further allege that Ms. Wrobleski marketed and attempted to sell unauthorized copies of the Plaintiffs' intellectual property.  See Amended Verified Complaint ¶ 118.  The Plaintiffs alleged that Ms. Wrobleski willfully infringed their rights.  See Amended Verified Complaint ¶ 19.  And, the Plaintiffs allege that Ms. Wrobleski's infringement "has caused, and will continue to cause damage to Darer's and 4Structures' business, goodwill, reputation and profits."  See Amended Verified Complaint ¶ 120. Despite having signing a verified complaint swearing to each of these allegations, the Plaintiffs now withdraw almost this entire claim, undoubtedly because they neither had at the commencement of the case, nor were they able to ascertain during discovery, any evidence to support their false allegations.  The only "copyright" infringement claim now pursued by the Plaintiffs is the frivolous allegation that Ms. Wrobleski infringed their copyright by allegedly briefly showing their website to Viren Patel.

2.    While the Plaintiffs appear to contend that all aspects of their website are their proprietaryk intellectual property that is subject to and is protected by the Copyright Act, the Act in fact protects only expression and not the underlying ideas encompassed in the Plaintiffs' intellectual property.  Therefore, to the extent that the Plaintiffs claim they possess a unique business model, process or plan, such ideas cannot be copyrighted, and any claim of copyright

infringement of such alleged intellectual property must be rejected.

3.    "Copyright protection subsists in original works of authorship fixed in any tangible medium of expression, however, this protection has never accorded copyright owner complete control over all possible uses of his work; rather, the Copyright Act grants the copyright holder exclusive rights to use and to authorize the use of his work in five [now six] qualified ways, including reproduction of copyrighted works in copies."  Sony Corp. of America v. University City Studios, Inc., 464 U.S. 417, 433 (1984).

4.    "To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work."  Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir. 2002) (citations omitted), cert. denied, 538 U.S. 1032 (2003).  "Copying is a 'shorthand reference to the act of infringing any of the copyright owner's five [now six] exclusive rights set forth at 17 U.S.C. § 106.'"  Id. (citing Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir.1991), cert. denied, 502 U.S. 939 (1991)).

5.    An owner of a copyright has the exclusive rights to do and to authorize any of the following:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works to perform the copyrighted work publicly;
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
> (6) in the case of sound records, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

6.    The Plaintiffs' claim of copyright infringement does not state a viable claim because the Plaintiffs do not now even allege that Ms. Wrobleski unlawfully *copied* their

4

website.  See Feist Publications v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) (in order to

establish copyright infringement, plaintiff must prove "copying of constituent elements of the

work that are original") (emphasis added).

7.      At most, Ms. Wrobleski is alleged only to have invited Viren Patel to her home

and shown their website to him without their authority.  Briefly showing a website to a single

individual does not, as a matter of law, constitute a public *performance*.  To the extent such a

demonstration could constitute a public *display*, the display was so cursory and incomplete that it

could constitute nothing more than a minimal "fair use" of the allegedly protected material.  See

17 U.S.C. § 107 ("fair use" includes use for "comment").  Showing a prospective employer

copyrighted material owned by another for the limited purpose of displaying one's work does not

constitute copyright infringement, and even were such use questionable, it would constitute "fair

use" of another's copyright.

8.      Even if Ms. Wrobleski's showing of the website were found to constitute a

display or performance, it could not constitute the *public* performance or *public* display of

copyrighted material necessary to support an infringement claim.

9.      To perform or display a work "publicly" means:

> (1) to perform or display it at a place open to the public or at any
> place where a substantial number of persons outside of a normal
> circle of a family and its social acquaintances is gathered; or
> (2) to transmit or otherwise communicate a performance or display
> of the work to a place specified by clause (1) or to the public, by
> means of any device or process, whether the members of the public
> capable of receiving the performance or display receive it in the
> same place or in separate places and at the same time or at
> different times.

17 U.S.C. § 101.  Far from being open to the public or at a place where a substantial number of

persons are gathered, Ms. Wrobleski's alleged actions of displaying the website to Viren Patel

occurred in the most private of places, her home.  Any alleged unauthorized display or

performance of the Plaintiffs' website in Ms. Wrobleski's home cannot be viewed as anything

more than a completely *private* display or performance, even if it did constitute either.  The

Copyright Act provides a limited bundle of rights, and it simply does not protect such private actions.

10.     Ms. Wrobleski has not made any unauthorized copies of the Plaintiffs' website and, therefore, judgment on this claim must enter in favor of Ms. Wrobleski.

11.     Even had Ms. Wrobleski somehow "copied" the Plaintiffs' website by showing it to someone else, said copying would not have constituted a copyright infringement because the Plaintiffs do not hold a copyright protectable interest in the general characteristics of their website, that are shared by many websites.

12.     The U.S. Constitution limits copyright protection to original works of authorship. See Feist Publications, Inc. v. Rural Telephone Serv. Co., 499 U.S. 340, 345 (1991) (the "sine qua non of copyright is originality" and "[o]riginality is a constitutional requirement"). Copyright protects only those constituent elements of a work that possess more than a *de minimis quantum* of creativity.  Id. at 348.  Although the Plaintiffs' website may provide them with a marketable tool in selling their services, there is nothing original about its functionality that warrants copyright protection other than the exact form of expression utilized by the Plaintiffs in, for example, the exact layout of their screen display or the compilation of their original and open source code.

13.     "It is axiomatic that copyright does not protect ideas, but only expressions of ideas."  Whelan Associates v. Jaslow Dental Library, 797 F.2d 1222, 1234 (3d Cir. 1986), cert. denied, 479 U.S. 1031 (1987).  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).  Thus copyright law forces "a distinction between ideas and functional items (which are not protected) and creative, expressive works (which are)." See O.P. Solutions, Inc. v. Intellectual Property Network, Ltd., NO. 96 Civ. 7952 (LAP), 1999 WL 47191 at *8 (S.D.N.Y. Feb. 2, 1999) (citing Baker v. Selden, 101 U.S. 99, 103 (1879)).

6

Thus, for example, the menu command hierarchy of a spreadsheet program is an unprotectable "method of operation" under 17 U.S.C. § 102(b).  See Lotus Dev. Co. v. Borland, Inc., 49 F.3d 807 (1st Cir. 1995), aff'd, 516 U.S. 233 (1996).  This concept precludes the Plaintiffs from claiming, as they do, that all aspects of their website are entitled to copyright protection.

14.    "The merger doctrine ... restricts the realm of protectable material by recognizing that although 'expression' of an idea is entitled to protection, even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself."  Id. (internal quotation marks omitted) (citing Gennessee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 146 (2d Cir. 1997)).  To the extent the Plaintiffs claim that the general layout of their website is protected by their copyright protection, such claim fails as a matter of law.

15.    The scenes a faire doctrine "strips protection from expression made in the form of stock features required by specifications of the computer itself and supported software, or by industry standards and customary programming practices."  Id. at *8 (citations and internal quotation marks omitted).  "The scenes a fair doctrine ... denies protection to stock devices that are either standard expressions within a particular industry or are standard programming techniques."  Id. (quoting Harbor Software, Inc. v. Applied Sys. Inc., 925 F. Supp. 1042, 1048 (S.D.N.Y. 1996)).  To the extent the Plaintiffs claim that the general layout of their website is protected by their copyright protection, such claim fails as a matter of law.

16.    "Protection is not accorded to expressive elements taken from the public domain." There is "no reason to make an exception to this rule for elements of a computer program that have entered the public domain."  Id. at *9 (quoting Computer Assoc., Inc. v. Altai, Inc., 982 F.2d 693, 710 (2d Cir. 1992)).  Almost all of the expressive elements of the Plaintiffs' website were taken from the public domain, as they are similar to the elements utilized by many websites and other computer programs.

17.    In order to show an unlawful "distribution" of a copyrighted work pursuant to 17

7

U.S.C. § 106(3), the Plaintiffs must show that an unlawful copy was disseminated "to the public." Hotalling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 203 (4th Cir. 1997). "Infringement of the distribution right requires an actual dissemination of ... copies." National Car Rental Sys. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 434 (8th Cir. 1993) (citing 2 Nimmer on Copyrights § 8.11[A], at 8-124.1), cert. denied, 510 U.S. 861 (1993).

18.     The Plaintiffs are not entitled to injunctive relief because there is no threat of infringement. Since prior to the commencement of this action, Ms. Wrobleski has abandoned any claim to ownership of their software or website. "Generally, a plaintiff must show the threat of [a] continuing violation in order to be entitled to injunctive relief." Peer Intern. Corp. v. Luna Records, Inc., 887 F. Supp. 560, 570 (S.D.N.Y. 1995) (internal citation omitted); see also Universal Studios, Inc. v. Sony Corp. of America, 659 F.2d 963, 976 (9th Cir. 1981) ("[A]s a general rule, a copyright plaintiff is entitled to a permanent injunction when liability has been established and there is a threat of continuing violations."), rev'd on other grounds, 464 U.S. 417 (1984). "When there is no probability or threat of continuing infringements, injunctive relief is ordinarily inappropriate." Harolds Stores, Inc. v. Dillard Department Stores, Inc., 82 F.3d 1533, 155 (10th Cir. 1996) (citing Nimmer & Ninner, § 14.06[B], at 14-97 to 14-98), cert. denied, 519 U.S. 928 (1996). Because Ms. Wrobleski does not have any of the Plaintiffs' allegedly copyright protected material in her possession, there is no possibility or threat that she will infringe the Plaintiffs' copyright. Indeed, no such possibility or threat existed even at the time the Plaintiffs' commenced this litigation.

19.     Any alleged threat or probability that Ms. Wrobleski would infringe the Plaintiffs' copyright ceased to exist in advance of the commencement of this litigation and, therefore, no injunctive relief ever was necessary.

20.     "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to

the prevailing party as part of the costs."  17 U.S.C. § 505.

21.    Attorneys' fees should be awarded to Ms. Wrobleski on Plaintiffs' claim:

[T]he Supreme Court's decision in <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), ... changed the standard in this circuit for determination of fee awards under the Copyright Act.  17 U.S.C. § 505 provides that, in any copyright infringement action, the court "in its discretion may allow the recovery of full costs by or against any party ... [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs."  In <u>Fogerty</u>, [the Supreme Court held] .... that prevailing plaintiffs and prevailing defendants must be treated alike for purposes of attorney's fee awards. 510 U.S. at ----, 114 S.Ct. at 1033.  Attorney's fees are not to be awarded automatically to a prevailing party, the Court held, but "only as a matter of the court's discretion." <u>Id</u>. The Court noted that "[s]ome courts ... have suggested several nonexclusive factors" which "may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." Id. at ---- n. 19, 114 S.Ct. at 1033 n. 19. These factors include: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." <u>Id</u>. (quoting <u>Lieb v. Topstone Indus., Inc.</u>, 788 F.2d 151, 156 (3d Cir.1986)).

<u>Knitwaves, Inc. v. Lollytogs Ltd</u>, 71 F.3d 996, 1011-12 (2d Cir. 1995).  Ms. Wrobleski here is the prevailing party, and she is entitled to an award of her costs and attorney's fees because of the objectively unreasonable nature of the Plaintiffs' copyright claim and because of the improper motivation for the Plaintiffs' pursuit of this claim.

## SECOND COUNT - BREACH OF CONTRACT

FINDINGS OF FACT:

1.    The Plaintiffs do not allege, and have not proven, any of the terms of the alleged consulting agreement between Wrobleski and 4Structures other than that Ms. Wrobleski agreed to perform computer consulting services at a fixed hourly rate of $100 per hour commencing in or about January 2002.  (Darer testimony).

2.    From 1996 until in or about June 2001, Ms. Wrobleski and John Darer, the sole owner of the Plaintiff 4Structures.com, enjoyed a strong friendship.  The two first met through an internet dating service, Match.com.  For many years, the two shared personal and professional

problems and issues as part of their ongoing, devoted friendship.  Indeed, as part of said friendship and in her attempt to assist John Darer in growing his business, Ms. Wrobleski assisted John Darer with many computer related problems and desires with respect to his structured settlement business.  (Darer testimony).

3.        As a result of their friendship, Ms. Wrobleski provided the Plaintiffs with advice and assistance concerning their desire to build a website devoted to the structured settlement industry.  Ms. Wrobleski devoted many hours to those endeavors.  (Darer testimony).

4.        Ms. Wrobleski first attempted to assist the Plaintiffs in accomplishing their goals by working with a single programmer, Greg Bush, who would do programming for the Plaintiffs as a part-time evening job.  When the Plaintiffs' needs expanded so that it was no longer realistic for a single, part-time individual to develop the Plaintiffs' project, Ms. Wrobleski ultimately introduced the Plaintiffs to her then employer, Smartspares d/b/a "Sybits."  Simultaneously, the Plaintiffs budget also significantly expanded when the Plaintiffs finally realized the expense involved in developing a website that they wanted.  (Darer testimony, Greg Bush testimony).

5.        From in or about June 2001 to January 2002, the Plaintiffs engaged Sybits, and Sybits successfully developed a website that first "went live" on the internet on or about August 15, 2000.  (Darer testimony).

6.        Sybits terminated Ms. Wrobleski's employment in September 2000, and the Plaintiffs ultimately sought to retain Ms. Wrobleski to replace Sybits in further developing and maintaining their website.  Although Ms. Wrobleski previously had provided all services free of charge to the Plaintiffs as part of their friendship, John Darer induced Ms. Wrobleski to become a paid computer consultant in or about January 2001 with the promise, among others, that the two eventually would become partners in this and other structured settlement industry software endeavors.  (Darer testimony).

7.        Thus, although contending that the Plaintiffs "engaged Wrobleski to provide software development services" on or about January 2000, see Amended Verified Complaint ¶

10

31, at that time, Ms. Wrobleski provided such services free of charge, at her discretion and not pursuant to any contract.  During said time period, Ms. Wrobleski performed services as a volunteer and friend of John Darer.  No contract existed requiring Ms. Wrobleski to perform any services or requiring the Plaintiffs to provide any compensation at that time.  Moreover, there were no other terms of a contract that could have supported a breach of contract claim, even had consideration existed for any agreement.  (Darer testimony).

8.       On or about January 2002, the Plaintiffs retained Ms. Wrobleski pursuant to a simple oral contract.  With respect to the scope of Ms. Wrobleski's services, the agreement was that Ms. Wrobleski would, at the Plaintiffs' request, perform software development services and be compensated at the rate of $100 per hour.  The Plaintiffs ultimately requested that Ms. Wrobleski perform numerous types of consulting services, including but not limited to, interfacing with Dr. Wang and other potential programmers, regarding the development of their website, consulting with their lawyers regarding actual or potential litigations, and assisting the Plaintiffs with other computer or technology issues, including assisting them in locating other professionals.  (Darer testimony, Wang testimony, Hayden Brainard testimony).

9.       Any agreement between the Plaintiffs and Ms. Wrobleski did not contain specific promises of results such that a breach of contract claim could be made for failure to meet such results, other than with respect to compensation.  (Darer testimony).

10.      Ms. Wrobleski satisfactorily performed all services requested of her by the Plaintiffs.

11.      The Plaintiffs failed to pay Ms. Wrobleski in accordance with their agreement.  Darer testimony.

12.      Ms. Wrobleski was not motivated by any desire to harm the Plaintiffs in taking any actions with respect to her consulting relationship with the Plaintiffs.

13.      Ms. Wrobleski has never taken any actions with respect to the Plaintiffs with an intent or motivation to harm the Plaintiffs.  To the contrary, all of Ms. Wrobleski's actions were

11

motivated by a good faith desire to benefit the Plaintiffs and especially her former close friend, plaintiff John Darer.

CONCLUSIONS OF LAW:

1.      "It is well established that the elements to form the basis of a breach of contract claim are that there was a formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Rosato v. Mascardo, 82 Conn. App. 396, 411 (2004) (citations and internal quotation marks omitted). Here, there is no evidence of an agreement with terms sufficient to support a breach of contract claim.

2.      "It is a general rule of contract law that a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract." Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384, 391 (1989). Thus, because the Plaintiffs ultimately refused to pay Ms. Wrobleski for her services, they cannot claim that Ms. Wrobleski breached any agreement by refusing to continue to perform services.

3.      Under the law of contracts, a promise is generally not enforceable unless it is supported by consideration. See E. Farnsworth, Contracts (1982) § 2.9, p. 89; A. Corbin, Contracts (1963) § 193, p. 188; State National Bank v. Dick, 164 Conn. 523, 529 (1973). Therefore, there was no enforceable contract between Ms. Wrobleski and the Plainitffs until January 2002, at which time Ms. Wrobleski promised to perform services in exchange for the Plaintiffs' promise to compensate her at the rate of $100 per hour. Prior to that time, all of Ms. Wrobleski's services were the equivalent of a non-binding contractual gift.

4.      While, in hindsight, the Plaintiffs may regret having hired Ms. Wrobleski because of a falling out of their friendship or even because they no longer trust Ms. Wrobleski and are no longer confident of her competency, such regret does not support a breach of contract claim.

5.      Exemplary damages may be awarded for breach of contract "only when the breach is aggravated by particularly egregious conduct on the part of the defendant." L.F. Pace

12

& Sons v. Travelers Indemnity Co., 9 Conn.App. 30, 48, cert. denied, 201 Conn. 811 (1986).

6.    The Connecticut Supreme Court explained when recovery of punitive damages for breach of contract is permissible in Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116 (1966):

> Punitive damages are not ordinarily recoverable for breach of contract. Restatement, 1 Contracts § 342; 5 Corbin, Contracts § 1077; McCormick, Damages § 81. This is so because, as lucidly reasoned by Professor Corbin in the passage cited, punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship. The few classes of cases in which such damages have been allowed contain elements which bring them within the field of tort. It is, of course, settled law that, in certain cases of tort, punitive or exemplary damages may properly be awarded. In Connecticut, however, recovery is limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs.
>
> ****
> The flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence. The Restatement declares that punitive damages may be awarded only for "outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." Restatement, 4 Torts § 908, comment (b).

154 Conn. at 127-28.

7.    The Plaintiffs have neither alleged nor proven any tortious conduct sufficient to justify punitive or exemplary damages for the alleged breach of contract. As a matter of law, even if the Plaintiffs' allegations of breach of contract were true, they would not constitute sufficiently egregious conduct to justify an award of exemplary damages.

**THIRD COUNT - BREACH OF SETTLEMENT AGREEMENT**

FINDINGS OF FACT:

1.    Ms. Wrobleski in no way has violated the Settlement Agreement as alleged in paragraphs 46 and 47 of the Amended Verified Complaint.

2.      Ms. Wrobleski has not interfered with the Plaintiffs' use and ownership of their intellectual property.

3.      Ms. Wrobleski has never taken any actions with respect to the Plaintiffs with an intent or motivation to harm the Plaintiffs.  To the contrary, all of Ms. Wrobleski's actions were motivated by a good faith desire to benefit the Plaintiffs and especially her former close friend, plaintiff John Darer.

CONCLUSIONS OF LAW:

SEE ABOVE, CONCLUSIONS OF LAW WITH RESPECT TO 2nd COUNT.

**FOURTH COUNT - COMPUTER FRAUD AND ABUSE, 18 U.S.C. §§ 1030(a)(4)**
FINDINGS OF FACT:

1.      Ms. Wrobleski has never accessed the Plaintiffs' website or other computers with intent to defraud or without authorization.  To the contrary, Ms. Wrobleski's intent each time she accessed the Plaintiffs' computer system was for the purpose of performing the tasks assigned to her by the Plaintiffs, for the benefit of the Plaintiffs.

2.       Ms. Wrobleski never exceeded her authorized access with respect to the Plaintiffs' website.

3.      Ms. Wrobleski never accessed the Plaintiffs' website and obtained anything of value from it.  To the contrary, each time Ms. Wrobleski accessed the Plaintiffs' website, she intended to, and did, access the website for the purpose of imparting value to the Plaintiffs.

4.      Even had Ms. Wrobleski accessed the Plaintiffs' website for an improper purpose and otherwise sought to defraud the Plaintiffs, which she expressly denies, she did so only for the purpose of using the computer and the value of such use was less than $5,000.  (Darer testimony, Plaintiffs' Detailed Information Regarding Claims for Damages).

5.      Even had Ms. Wrobleski shown the Plaintiffs' website, the evidence is that she

14

did so for the exclusive purpose of displaying and/or confirming her skills and work experience with Viren Patel, as Viren Patel testified that Ms. Wrobleski "showed me very briefly a few part of the system to give me an idea saying she has developed the system and she has knowledge of the structured settlement industry and pretty much to, like, basically establish a confidence that she is a capable person and she does know the business." Deposition of Viren Patel, p. 41. Mr. Patel further testified that the alleged demonstration of the Plaintiffs' website was "superficial," lasting "between five and ten minutes" and that it was "not in detail at all." Id. at p. 44. (Viren Patel deposition and/or testimony).

6.    While Ms. Wrobleski was working with the Plaintiffs, there was no oral or written agreement that precluded Ms. Wrobleski from providing similar consulting services to other individuals or companies (such as Mr. Patel's) within or without the structured settlement industry.

7.    During the time period that Ms. Wrobleski is alleged to have shown the Plaintiffs' website to Viren Patel, Ms. Wrobleski was not prohibited from utilizing the website as an example of her work for other potential employers.

8.    Had Ms. Wrobleski shown the Plaintiffs' website to Viren Patel, her access to Plaintiffs' website for this purpose was not gained without authority.

CONCLUSIONS OF LAW:

1.    As relevant to the Plaintiffs' claim, 18 U.S.C. § 1030(a)(4) provides:

> (a) Whoever ... (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period ... shall be punished ....

2.    Ms. Wrobleski is not liable for violation of 18 U.S.C. § 1030(a)(4) because her proven conduct does not satisfy any of requirements for liability under this section.

15

3.      Even had Ms. Wrobleski provided Viren Patel with limited access to the Plaintiffs' website, the only evidence is that she provided a "superficial," short demonstration for between five and ten minutes, for the purposes of demonstrating her general knowledge of the industry and in order to gain Mr. Patel's confidence.  Such conduct in no way can be said to have been intended to defraud the Plaintiffs.

4.      Pursuant to 18 U.S.C. § 1030(g), the Plaintiffs do not state a claim upon which a civil action may be based for violation of § 1030(a)(4) because the conduct did not cause, and if completed could not have caused, a loss of at least $5,000 in value.


**FIFTH COUNT - COMPUTER FRAUD, 18 U.S.C. § 1030(a)(5)(B)**

FINDINGS OF FACT:

1.      Ms. Wrobleski has never accessed the Plaintiffs' website without authorization. She did, however, frequently access the Plaintiffs' computer system in order to accomplish the tasks assigned to her by the Plaintiffs.

2.      Ms. Wrobleski never intended any fraud with respect to the Plaintiffs' website.

3.      Ms. Wrobleski never caused damage to the Plaintiffs' website.  (Wang Testimony).

4.      Even if Ms. Wrobleski accessed the Plaintiffs' website without authorization and caused damage, both of which accounts she expressly denies, any damaged caused would have been caused, at most, negligently, as an unintended consequence of Ms. Wrobleski's endeavors to complete the tasks assigned to her by the Plaintiffs.  (Wang testimony).

CONCLUSIONS OF LAW:

1.      As relevant to the Plaintiffs' fifth count, 18 U.S.C. § 1030(a)(5)(B) provides:

> (a) Whoever ... (5)(B) by conduct described in clause (i), (ii), or
> (iii) of subparagraph (a), caused (or in the case of an attempted

16

offense, would, if completed, have caused) --
(i) loss to 1 or more persons during any 1-year period ...
aggregating at least $5,000 in value ... shall be punished ....

2.     Clauses (i), (ii), and (iii) of subparagraph (a) provide:

(i) knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damages; or (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage ...

3.     Ms. Wrobleski is not liable for violation of 18 U.S.C. § 1030(a)(5)(B) because her proven conduct does not satisfy any of requirements for liability under this section.

4.     Ms. Wrobleski never caused damage, in any respect, to the Plaintiffs' website that would support a claim of violation of 18 U.S.C. § 1030(a)(5)(B).

5.     Ms. Wrobleski did not recklessly cause any damage to the Plaintiffs' computer system.

6.     Pursuant to 18 U.S.C. § 1030(e)(11), a "loss" means:

any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service ....

7.     The Plaintiffs did not experience a loss relating to the August 2002 "crash" of their computer system, because the reasonable cost to them of said "crash" did not exceed $5,000, as the Plaintiffs offer insufficient proof of lost revenues or costs.

8.     In calculating the Plaintiffs' loss pursuant to 18 U.S.C. § 1030(e)(11), it is improper for the Plaintiffs to include costs of increasing the security of their system.

**SIXTH COUNT - COMPUTER FRAUD AND ABUSE, 18 U.S.C. § 1030(a)(5)(C)**

FINDINGS OF FACT:

1.      Ms. Wrobleski never accessed the Plaintiffs' computer system or took any other action adverse to the Plaintiffs' interests for the purpose of her own commercial advantage or private financial gain.  To the contrary, all actions taken by Ms. Wrobleski with respect to the Plaintiffs' computer system were taken with the intention of benefitting the Plaintiffs.  (Wang testimony).

2.      Ms. Wrobleski did not cause any damage to the Plaintiffs' computer system, recklessly or otherwise.

CONCLUSIONS OF LAW:

1.      In pleading the Sixth Count of their complaint, the Plaintiffs appear to be replying upon an outdated version of the statute, as the current version of the referenced statute does not contain a section 1030(a)(5)(C).

2.      To the extent the Court deems this count a claim for "reckless" damages pursuant to 18 U.S.C. § 1030(a)(5)(A)(ii) and (a)(5)(B)(i), Ms. Wrobleski respectfully incorporates the findings of fact and conclusions of law set forth above with respect to the Plaintiffs' fifth count.

**SEVENTH COUNT - COMPUTER RELATED OFFENSE, CONN. GEN. STAT. § 52-570b**

FINDINGS OF FACT:

1.      Ms. Wrobleski never accessed the Plaintiffs' computer system without authority, nor did she steal computer services or otherwise misuse the Plaintiffs' computer system information.

2.      Ms. Wrobleski neither intentionally nor recklessly disrupted or caused the disruption of the Plaintiffs' computer system.

3.      Ms. Wrobleski did not intentionally and without authorization obtain and use data she "knew or believed was obtained in violation of Conn. Gen. Stat. § 53a-251 or (2) [sic]."  See

18

Amended Verified Complaint ¶ 162.

4. Ms. Wrobleski caused no damage to the Plaintiffs' computer system at any time.

CONCLUSIONS OF LAW:

1. Ms. Wrobleski did not violate Conn. Gen. Stat. § 52-570b, as the facts proven by the Plaintiffs do not support liability under this section.

2. Had Ms. Wrobleski shown the Plaintiffs' website to Viren Pattel in the superficial, brief matter contended by Mr. Patel, pursuant to Conn. Gen. Stat. § 53a-251(b)(2)(B), Ms. Wrobleski reasonably could not have known that it was unauthorized for her to take said action. Therefore, Ms. Wrobleski cannot be found liable to the Plaintiffs.

3. Pursuant to Conn. Gen. Stat. § 52-570b(c), an award of treble damages would be appropriate only if the Plaintiffs had pled and then proven "wilful and malicious conduct." The Plaintiffs have done neither.

4. The Plaintiffs are not prevailing parties within the meaning of Conn. Gen. Stat. § 52-570b(e), and they therefore are not entitled to reasonable costs and reasonable attorney's fees for their prosecution of this claim. To the contrary, Ms. Wrobleski is the prevailing party with respect to this claim and entitled to reasonable costs and reasonable attorney's fees.

**EIGHTH COUNT - CONNECTICUT UNIFORM TRADE SECRETS ACT**

FINDINGS OF FACT:

1. The Plaintiffs have a grossly inflated view of what trade secrets they possess. (Darer testimony and, if necessary, Darer deposition testimony, Viren Patel deposition or testimony, Wang testimony).

2. Any information allegedly disclosed by Ms. Wrobleski when she is alleged to have shown the Plaintiffs' website to Viren Patel does not constitute a trade secret. Said information allegedly disclosed to Viren Patel is generally known to other persons who can

19

obtain economic value from its disclosure or use.  (Wang testimony, Darer testimony, Viren Patel deposition or testimony).

3.      The information allegedly disclosed to Viren Patel is readily ascertainable by proper means.  Although such information does not and cannot constitute a "secret" capable of trade secret protection, if such information were a secret, it has already been disclosed to many others without the Plaintiffs having attempted to maintain protection for said "secrets."  (Darer testimony, Wang testimony).

4.      Much of the information, business plans and other matters the Plaintiffs claim as their proprietary intellectual property was copied from other businesses and websites in the public domain.  (Wang testimony, Darer testimony).

5.      The Plaintiffs did not use reasonable efforts to maintain the secrecy of their website, as they allowed many to work on the website or view it.  (Darer testimony, Wang testimony, Greg Bush testimony).

6.      The information allegedly disclosed to  Viren Patel is not the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  Aside from commencing litigations to punish those who were unfortunate enough to have assisted the Plaintiffs in developing their website, the Plaintiffs have done little to protect said information.  To the contrary, the Plaintiffs have voluntarily disclosed said information to third parties on numerous occasions without attempting to maintain its secrecy.  (Darer testimony).

7.      The Plaintiffs have displayed their website in sales demonstrations and marketing efforts on numerous occasions.  Had Ms. Wrobleski given Viren Patel a brief tour of the Plaintiffs' website, any information disclosed would have been no more than what is regularly disclosed by the Plaintiffs to others in their attempts to market and sell their services.  (Darer testimony).

8.      The Plaintiffs have shown their website to others without endeavoring to have said individuals maintain the secrecy of their website.  Said individuals include potential

computer professionals they interviewed, their attorneys, their friends, their current and former consultants or employees, their clients, and their potential clients.  (Darer testimony).

9.      Prior to allowing Ms. Wrobleski or Dr. Wang to work on their website, the Plaintiffs did not require either to sign a confidentiality agreement.  (Darer testimony, Wang testimony).

10.     Ms. Wrobleski did not misappropriate or assist others in misappropriating any trade secret owned by the Plaintiffs.  (Wang testimony, Viren Patel deposition or testimony).

11.     The Plaintiffs have suffered no damages as a result of the alleged misappropriation of trade secrets.  (Darer testimony).

CONCLUSIONS OF LAW:

1.      Under the Connecticut Uniform Trade Secrets Act, liability may be established only if the Plaintiffs can prove the existence of a trade secret pursuant to Conn. Gen. Stat. § 35-51(d) that has been misappropriated pursuant to Conn. Gen. Stat. § 35-51(b).

2.      There is no support for the Plaintiffs' claim that any trade secret was misappropriated because, as a matter of law, the general ideas behind their website are not trade secrets and because factually those ideas were not misappropriated.

3.      Any information allegedly disclosed by Ms. Wrobleski during the brief demonstration that she allegedly provided to Viren Patel would not have constituted a trade secret, as the layout and functions performed by the Plaintiffs' website do not constitute a trade secret.  See IDX Systems Corp. v. Epic Systems Corp., 285 F.3d 581 (7th Cir. 2002) (the appearance of data-entry screens "are exceedingly hard to call trade secrets" because "things that any user or passer-by sees at a glance are 'readily ascertainable by proper means'"; "a trade secret claim based on readily observable material is a bust").

4.      The various pages of the Plaintiffs' website do not constitute trade secrets.

5.      Forms and expressions of ideas that have been registered with the Copyright

Office and are readily available to the public do not constitute trade secrets.  Therefore, the Plaintiffs' web pages cannot be trade secrets.  See Air Support, Inc. v. Maurice Acuna, Inc., No. CV050148386S, 1996 WL 362097 at *2 (Conn. Super. May 26, 1996) (citing Robert S. Weiss & Associates, Inc. v. Weidlight, 208 Conn. 525 (1988)) ("An element of secrecy must exist to the extent that it would be difficult for someone else to acquire the information except by the use of improper means.").  "There is not trade secret if the [information alleged to be a trade secret] can be readily ascertained through ordinary business channels or reference sources."  Id.

6.     "An employee has a right to grow with his experience, and he can carry away for general use his skill and everything that he has learned at his place of employment, except trade secrets."  Wentworth Laboratories, Inc. v. Probe 2000, Inc., No. CV020346892S, 2002 WL 31758350 at *2 (Conn. Super. Nov. 19, 2002) (quoting A.B.A., Trade Secrets:  A State-by-State Survey (A. Pedowitz & R. Sikkel eds., 1997), p. 147).

7.     Knowledge that is held by an average computer user after using a computer program that might, itself, constitute a trade secret is not sufficient to state a claim for misappropriation of any trade secret embodied in a computer program.  See Beer & Wine Services, Inc. v. Dumas, 2d Civil No. B151792, 2003 WL 1194725 (Cal. App. 2 Dist. Mar. 17, 2003).  Even if the general idea for a computer program comes from an individual's experience with his or her former employer's trade secret protected program, general ideas about automating business processes, reporting and computerizing functions do not constitute trade secrets.  Id. at *8.  A defendant that is charged with a specious misappropriation claim premised upon the alleged theft of such a general idea is entitled to attorney's fees for his defense of such an action. Id. at *9.

8.     Federal copyright law requires every applicant for a copyright to submit a copy of the material to the Copyright Office.  See 17 U.S.C. § 407, 408.  Said submissions are open for public inspection.  See 17 U.S.C. § 705(a), (b).  The readily available access to the Plaintiffs' software through the Copyright Office precludes a finding that the web pages enjoy trade secret

22

protection.  The web pages also are readily available because anyone interested could simply express to the Plaintiffs interest in their services and thereby request and obtain a tour of the Plaintiffs' website from the Plaintiffs.  Indeed, the Plaintiffs regularly market their services in such a manner.

9.    Even had Ms. Wrobleski created a computer software package or website that performed all of the same functions as those performed by the Plaintiffs' product, which she has not done, so long as she did not utilize the Plaintiffs' proprietary software code, there would be no trade secret violation.  "Trade secret law does not offer protection against reverse engineering.  Patent law gives protection against copying a product, but trade secret law does not."  SNA, Inc. v. Array, 51 F. Supp.2d 554, 567 (E.D. Pa. 1999) (citing Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476 (1974) and Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 160 (1989)), aff'd, 259 F.3d 719 (3d Cir. 2001).

10.    The Plaintiffs have not taken reasonable efforts to protect and maintain the secrecy of any information included within their website that otherwise might have been capable of trade secret protection.  In addition to the Plaintiffs' sharing of their website with potential and actual customers, the Plaintiffs also shared such information with Ms. Wrobleski, Dr. Wang and many others without requiring the signing of a confidentiality agreement.  See Jay's Custom Stringing, Inc. v. Yu, No. 01 Civ. 1690 (WHP), 2001 WL 761067 at *16 (S.D.N.Y. July 6, 2001) (former employee's access to alleged trade secrets without being required to sign any confidentiality agreement is inconsistent with an employer's subsequent claim that such information enjoys trade secret status).

11.    The Plaintiffs have not suffered any loss for the alleged violation of their alleged trade secrets, as there was no misappropriation.  See Conn. Gen. Stat. § 35-53.

12.    There has been no willful and malicious misappropriation and, therefore, the Plaintiffs are not entitled to punitive damages or reasonable attorney's fees.  See Conn. Gen. Stat. § 35-53(b).

13. Ms. Wrobleski is the prevailing party with respect to the Plaintiffs' claim of theft of trade secrets. Therefore, she is entitled to her reasonable attorney's fees. <u>See</u> Conn. Gen. Stat. § 35-53(b).

14. The Plaintiffs have pursued their claim of misappropriation in bad faith, and Ms. Wrobleski therefore is entitled to an award of reasonable attorney's fees. <u>See</u> Conn. Gen. Stat. § 35-54.

## TENTH COUNT - VIOLATION OF CONN. GEN. STAT. § 42-110a, et seq ("CUTPA")

FINDINGS OF FACT:

1. The Plaintiffs do not allege any facts to support this claim other than the facts alleged to support the preceding claims. Because the Plaintiffs' previously discussed claims fail as a matter of law or for want of any proof, the Plaintiffs also are not entitled to judgment on this claim.

CONCLUSIONS OF LAW:

1. Ms. Wrobleski respectfully incorporates the general conclusions of law regarding CUTPA, set forth with respect to the Seventh Count of her Counterclaims, as if set forth herein.

2. None of Ms. Wrobleski's conduct with respect to the Plaintiffs constitutes unfair competition or unfair trade practices in the conduct of business, trade or commerce or in the furnishing of services in Connecticut.

3. Ms. Wrobleski's actions were not immoral, oppressive, or unscrupulous, and they did not cause substantial injury to the Plaintiffs.

4. Neither punitive damages nor attorney's fees should be awarded to the Plaintiffs.

## TWELFTH COUNT - INTENTIONAL MISREPRESENTATION

FINDINGS OF FACT:

24

1.      Ms. Wrobleski did not misrepresent her academic or professional credentials to the Plaintiffs.  (Darer testimony).

2.      To the extent Ms. Wrobleski described her skills as a computer consultant, said description was made as a statement of opinion and not as a statement of fact.  (Darer testimony).

3.      Ms. Wrobleski informed plaintiff John Darer of her academic and professional credentials in the context of discussions between friends in or around 1996.  At the time Ms. Wrobleski informed Darer of her academic and professional accomplishments, Darer and ms. Wrobleski were either dating or good friends with no business relationship.  In fact, for several years after Ms. Wrobleski and Mr. Darer met and became familiar with each other's past experiences and accomplishments, Ms. Wrobleski assisted Mr. Darer with computer issues and problems associated with his business free of charge.  (Darer testimony).

4.      No statements Ms. Wrobleski made concerning her credentials ever were made in an attempt to induce the Plaintiffs' reliance so that the Plaintiffs would hire her.  Indeed, the Plaintiffs did not even discuss hiring Ms. Wrobleski personally until approximately November or December 2001, approximately five years after Ms. Wrobleski met Darer.  (Darer testimony).

5.      At the time the Plaintiffs engaged Ms. Wrobleski to provide software development services in December 2001 or January 2002, Ms. Wrobleski had been helping the Plaintiffs, sometimes occasionally and sometimes frequently, for approximately five years.  The Plaintiffs based their decision to retain Ms. Wrobleski's more extensive, paid services, upon the years of friendship and dealings between Ms. Wrobleski and Darer.  The Plaintiffs did not make the decision to retain Ms. Wrobleski in reliance upon her prior description of her credentials. (Darer testimony).

6.      Ms. Wrobleski in good faith delivered competent computer consultant services to the Plaintiffs during the entire time that she was working with the Plaintiffs, even though the Plaintiffs refused to pay for all of her time expended at first and eventually, near the conclusion of their relationship, unjustifiably denied her any compensation unless she signed a non-compete

25

agreement. (Darer testimony, Wang testimony, Correspondence between counsel, draft work pay for hire agreements).

7.     Ms. Wrobleski never made statements concerning her professional or academic credentials, or statements concerning any other matters, in an attempt to defraud the Plaintiffs.

8.     Ms. Wrobleski never intended to violate any of the Plaintiffs' rights.

9.     By following Ms. Wrobleski's recommendations with respect to the development of their website, the Plaintiffs greatly increased their revenues and profits. Thus, far from being harmed by their association with Ms. Wrobleski, the Plaintiffs' relationship with Ms. Wrobleski earned them, and continues to earn them, hundreds of thousands of dollars of profits. (Darer testimony, Darer tax returns).

CONCLUSIONS OF LAW

1.     The statute of limitations for an action founded in misrepresentation or fraud is three years. See Conn. Gen. Stat. § 52-577. Section 52-577 is an "occurrence statute" meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs. As the Supreme Court has stated:

> In construing our general tort statute of limitations, General
> Statutes § 52-577, which allows for an action to be brought within
> three years from the date of the act or omission complained of, we
> have concluded that the history of that legislative choice of
> language precludes any construction thereof delaying the start of
> the limitation period until the cause of action has accrued or the
> injury has occurred.

Fichera v. Mine Hill Corp., 207 Conn. 204, 212 (1988) (citations and internal quotation marks omitted); see also McDonald v. Haynes Medical Laboratory, 192 Conn. 327, 330 (1984) ("Unlike the statutes of other jurisdictions which begin to run only after the cause of action has accrued, the Connecticut statutes of limitations for torts commence with the act or omission complained of, which is when the tortious conduct of the defendant occurs and not the date when the plaintiff first sustains damage or first discovery injury.").

26

2.    Because the Plaintiffs' misrepresentation claims are premised upon alleged statements made more than three years prior to the time they asserted those claims, as part of their Amended Verified Complaint dated August 29, 2003, those claims are time barred.  Even if those claims were time, however, the Plaintiffs still would not be entitled to judgment.

3.    The elements of a claim for intentional misrepresentation or fraud are that:

> (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."

Parker v. Shaker Real Estate, Inc., 47 Conn. App. 489, 493 (1998).

4.    "The party asserting [an intentional misrepresentation or fraud] cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as 'clear and satisfactory' or 'clear, precise and unequivocal.'"  Weisman v. Kaspar, 233 Conn. 531, 539-540 (1995) (citations omitted).

5.    There is no support for the Plaintiffs' contention that Ms. Wrobleski misrepresented or stated anything false about her academic or professional credentials.

6.    Even if Ms. Wrobleski had overstated her expertise in the area of website development, which is denied, overstating one's skill or expertise constitutes "nothing worse than permissible puffing" and is not actionable as fraud.  See Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F. Supp. 741, 746 (S.D.N.Y. 1991); see also Charter Medical Management Co. v. Ware Manor, Inc., 159 Ga. App. 378, 383 (1981) (claim of fraud based upon defendant's alleged misrepresentation as to its expertise and experience failed, as the challenged statements were "mere commendation or 'puffing' and plaintiff showed that it took no action to ascertain the truth thereof").

7.    Representing that one would meet the applicable standards of competency for an occupation constitutes a malpractice or negligence claim, not a claim of misrepresentation. Clark v. Ward, No. X03CV990496095, 2002 WL 1150721 at *3 (Conn. Super. May 8, 2002).

Moreover, were such a claim permissible, an expert would be required to prove the truth or accuracy of the alleged "misrepresentation" as compared to the defendant's competency.  Id. Because no such expert has been offered on this issue, the Court cannot as a matter of law evaluate whether Ms. Wrobleski's skills met the standard of care appropriate for computer consultants.

8.      In electing to retain Ms. Wrobleski's computer consulting services and pay for them, to the extent the Plaintiffs relied upon statements made by Ms. Wrobleski to John Darer concerning her credentials, such reliance was unreasonable, as such statements were made in the context of their dating relationship or friendship and were not intended by Ms. Wrobleski to induce reliance.

9.      Ms. Wrobleski never made statements to the Plaintiffs concerning her academic or professional credentials for the purpose of inducing the Plaintiffs to act.

10.     The Plaintiffs have not been damaged as a result of Ms. Wrobleski's alleged misrepresentations.  To the contrary, Ms. Wrobleski's recommendations and hard work, a large part of which she was uncompensated for, resulted in the Plaintiffs greatly increasing their income.  Thus, the Plaintiffs have benefitted, rather than been harmed, by their retention of and relationship with Ms. Wrobleski.

11.     "To support an award of punitive damages [premised upon a common law fraud claim], the evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  Sorrentino v. All Seasons Services, Inc., 245 Conn. 756, 778 (1998) (internal quotation marks omitted).  A malicious and wanton injury justifying an award of punitive damages is one in which both the action producing the injury and the resulting injury were intentional. Markey v. Santangelo, 195 Conn. 76, 77 (1985).


**THIRTEENTH COUNT - INTENTIONAL MISREPRESENTATION**

FINDINGS OF FACT:

1.      Ms. Wrobleski respectfully incorporates the findings of fact related to the Twelfth Count with respect to the Plaintiffs' allegations that Ms. Wrobleski, with intent to defraud, misrepresented her academic and professional credentials to the Plaintiffs.

2.      Ms. Wrobleski respectfully incorporates the findings of fact related to the Twelfth Count with respect to the Plaintiffs' allegation that they relied upon Ms. Wrobleski's alleged misrepresentations in engaging her services as a software developer.

3.      To the extent the Plaintiffs' claim that Ms. Wrobleski recommended that the Plaintiffs engage Greg Bush and vouched for his abilities, said allegation is not pled in their complaint and is false.

4.      While Sybits, the company that worked on the development of the Plaintiffs' website after Greg Bush, may have believed that Greg Bush's work did not constitute "any useful software," there is no evidence upon which to conclude that Greg Bush did not provide competent and useful computer programming services.  (Greg Bush testimony).

5.      There is no connection or reliance relationship, pled or existing in fact, between Ms. Wrobleski's alleged misrepresentations concerning her credentials and the Plaintiffs' retention of Greg Bush.

6.      At the time the Plaintiffs first retained Greg Bush, he and Ms. Wrobleski both were employed by iSolve.com.  During that time, John Darer requested Ms. Wrobleski's assistance in locating a software programmer willing to assist him in the development of the Plaintiffs' website.  Ms. Wrobleski informed John Darer about the availability of Greg Bush to perform "moonlight" work, and John Darer requested that Ms. Wrobleski introduce the two of them.  (Greg Bush testimony, Darer testimony).

7.      At the Plaintiffs' request, Ms. Wrobleski introduced Greg Bush to John Darer.

8.      At no time did Ms. Wrobleski recommend that the Plaintiffs retain Greg Bush, nor did Ms. Wrobleski guarantee the competency of Greg Bush.  (Darer testimony).

CONCLUSIONS OF LAW:

1.      Ms. Wrobleski respectfully incorporates the conclusions of law relating to the Twelfth Count with respect to the Plaintiffs' legal claim that they have been damaged by Ms. Wrobleski's alleged misrepresentations.

2.      To the extent Ms. Wrobleski expressed an opinion as to the competency of Greg Bush to perform services for the Plaintiffs, said recommendation was an opinion and not a statement of fact.

3.      To the extent the Plaintiffs relied upon Ms. Wrobleski's statements concerning Greg Bush to their detriment, said reliance was not reasonable.

4.      The Plaintiffs have suffered no damages as a result of Ms. Wrobleski's alleged misrepresentations.  Simply because Sybits elected not to utilize the source code prepared by Greg Bush does not support the Plaintiffs' claim that Greg Bush was incompetent and that Ms. Wrobleski should be held liable for allegedly recommending him to them.  Regardless, there is no proof that Greg Bush was incompetent.

5.      The Plaintiffs cannot offer any support for their request that the Court determine that Greg Bush was incompetent to perform the software development services for which the Plaintiffs retained him.

6.      To the extent the Plaintiffs claim that Ms. Wrobleski's alleged misrepresentations concerning her credentials caused them to retain Greg Bush, they cannot prove that said misrepresentations caused them to suffer damages resulting from Greg Bush's subsequent alleged misconduct.

7.      "To support an award of punitive damages [premised upon a common law fraud claim], the evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  Sorrentino v. All Seasons Services, Inc., 245 Conn. 756, 778 (1998) (internal quotation marks omitted).  A malicious and wanton injury justifying an award of punitive damages is one in which both the action producing the injury and the resulting

30

injury were intentional. <u>Markey v. Santangelo</u>, 195 Conn. 76, 77 (1985).

**FOURTEENTH COUNT - INTENTIONAL MISREPRESENTATION**

Ms. Wrobleski believes that this count is duplicative of the Plaintiffs' Twelfth and Thirteen Counts. Ms. Wrobleski therefore respectfully incorporates the findings of fact and conclusions of law set forth with respect to the Twelfth and Thirteenth Counts as if fully set forth herein.

**FIFTEENTH COUNT - INTENTIONAL MISREPRESENTATION**
FINDINGS OF FACT:

1.      Ms. Wrobleski never submitted to the Plaintiffs false invoices for work not performed. (Wrobleski invoices).

2.      To the extent the invoices submitted to the Plaintiffs contained errors concerning time or specific task performed on specific dates, any such errors were innocent mistakes in no way intended to defraud the Plaintiffs.

3.      The Plaintiffs did not rely upon Ms. Wrobleski's alleged misrepresentations.

4.      The Plaintiffs received almost all of the work claimed to have been performed by Ms. Wrobleski. The sole exception to this statement is that the Plaintiffs did not receive the results of Ms. Wrobleski's review of the source code that she conducted in anticipation of preparing the documentation that had been demanded by the Plaintiffs. As with most computer professionals, Ms. Wrobleski's practice of drafting documentation is first to perform a detailed, unwritten review of the source code before beginning to draft documentation. Such a method is the most efficient for Ms. Wrobleski and many other computer professionals, as they ensure their fresh knowledge of the entire system before they commence drafting the written documentation. However, because the Plaintiffs terminated Ms. Wrobleski while she was still reviewing the Plaintiffs' system before she had commenced formalizing the documentation, Ms. Wrobleski

31

never had an opportunity to draft the documentation, the final stage of the documentation process. (Wrobleski invoices, Darer testimony).

5.     The Plaintiffs have not suffered any damage as a result of Ms. Wrobleski's alleged misrepresentation. Indeed, the Plaintiffs have not even paid for much of the work performed by Ms. Wrobleski, because she refused to sign a non-compete agreement with the Plaintiffs. (Wrobleski invoices, Darer testimony).


CONCLUSIONS OF LAW:

1.     Ms. Wrobleski respectfully incorporates by reference the conclusions of law set forth in the Plaintiffs' other fraud claims, the Twelfth and Thirteenth Counts.

2.     The Plaintiffs have not detrimentally relied upon Ms. Wrobleski's invoices, as they always refused to pay for the full amount of the time expended by her on the Plaintiffs' behalf.

3.     "To support an award of punitive damages [premised upon a common law fraud claim], the evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." Sorrentino v. All Seasons Services, Inc., 245 Conn. 756, 778 (1998) (internal quotation marks omitted). A malicious and wanton injury justifying an award of punitive damages is one in which both the action producing the injury and the resulting injury were intentional. Markey v. Santangelo, 195 Conn. 76, 77 (1985).

4.     The Plaintiffs are not entitled to punitive damages pursuant to this Count because they have failed to prove any misrepresentations concerning Ms. Wrobleski's invoices were made for a reason other than a simple mistake.


**NINETEENTH COUNT - DECLARATORY JUDGMENT**

FINDINGS OF FACT:

1.     There is no dispute concerning the ownership of the Plaintiffs' website and

computer system.  It is the Plaintiffs' property, and Ms. Wrobleski does not claim any ownership rights to it.

2.     Prior to the litigation of this matter, Ms. Wrobleski asserted her belief that the work she performed for the Plaintiffs was partially owned by her because of the Plaintiffs' refusal to pay her for said work.  Also pre-litigation, however, Ms. Wrobleski expressed frustration at the Plaintiffs' apparent intent to sue her, asserting that they should leave her alone because she acknowledged that they owned their system.  On numerous occasions both prior to and while this action has been pending, Ms. Wrobleski and her counsel have maintained the consistent position that they do not assert an ownership interest in the Plaintiffs' website, computer system or other intellectual property that they might own.[1]  (Transcript of telephonic conference, 10/8/02, correspondence between counsel, transcript of instant messaging, e-mails between parties).

3.     At the very commencement of this action, Plaintiffs' counsel expressly stated that Ms. Wrobleski was not claiming ownership of the work she performed for the Plaintiffs.  See Transcript of Telephone Status Conference, October 8, 2002, p. 12.  Ms. Wrobleski and her counsel have reiterated this position on several occasions prior to and after that date. (Correspondence between counsel).

---

[1] There is limited support for Ms. Wrobleski's short-lived contention that she might maintain ownership in the Plaintiffs' website because of their refusal to compensate her for the work she performed in developing it.  See Hughey v. Palographics, 189 U.S.P.Q. 527 (D. Colo. 1976) (presumption that a work for hire is owned by the employer or commissioning party does not apply where the contract is abandoned and both parties regard the contract to be at an end); Brown v. Cosby, 433 F. Supp. 1331 (E.D. Pa. 1977) (stating in dicta that the plaintiff could state a copyright infringement claim by pleading facts amounting to a material breach of contract and seeking to rescind); Black v. Pizza Time Theatres, Inc., No. C-83-20049-WAI, 1983 WL 1140 (N.D. Cal. August 15, 1983) (holding that by alleging a breach of an employment agreement and praying for rescission, an employee stated a claim for ownership of the copyrights under an exception to the work for hire doctrine).  "The weight of authority is to the contrary, however." See Warren v. Fox Family Worldwide, Inc., 171 F. Supp.2d 1057, 1073 (C.D. Cal. 2001), aff'd, 328 F. 3d 1136 (9th Cir. 2003).

Regardless, since prior to the commencement of this action, Ms. Wrobleski and her counsel have maintained the consistent position that she does not claim any ownership interest in the work she developed for the Plaintiffs.

4.      The Plaintiffs claim as their propriety intellectual property vast amounts of public knowledge, free source code, and unoriginal work that is not protected by any state or federal law.  (Darer testimony, Wang testimony, Viren Patel deposition or testimony).

5.      The Plaintiffs believe that Ms. Wrobleski is not entitled to work in the structured settlement industry because she learned general knowledge concerning the industry from the Plaintiffs.  (Darer testimony, Hayden Brainard testimony).

6.      Ms. Wrobleski does not currently work in the structured settlement industry, nor is she currently developing a software product for the structured settlement industry.

7.      Ms. Wrobleski does not have any of the Plaintiffs' alleged intellectual property in her physical possession.

CONCLUSIONS OF LAW:

1.      The Plaintiffs rely upon Conn. Gen. Stat. § 52-29 in support of their request for a declaratory judgment.  That statute, however, is a procedural statute authorizing Connecticut Superior Courts to issue declaratory judgments.  There is no support for the Plaintiffs' attempt to have this Court apply a state procedure authorized by Connecticut statute to be applied only by the Connecticut Superior Courts.  Moreover, even were the statute not so restrictively drafted, the Connecticut legislature clearly does not have authority to control the jurisdiction of the federal courts or to impose guidelines for this Court's determination of when a case or controversy exists.

2.      Disregarding the Plainitffs' improper reliance on state law, this Court is empowered to granted declaratory relief in limited situations, pursuant to the federal Declaratory Judgment Act and the U.S. Constitution:

> A federal court's Article III jurisdiction is limited to cases or controversies, U.S. Const. art III, Section 2, and, therefore, a federal court lacks the power to render advisory opinions or "to decide questions that cannot affect the rights of litigants in the case before [it]." Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330,

> 2334, 45 L.Ed.2d 272 (1975) (quoting North Carolina v. Rice, 404
> U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). Under
> the Declaratory Judgment Act a court of the United States "may
> declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could
> be sought." 28 U.S.C. Section 2201. This statute creating a remedy
> provides that a court may render a declaration only when presented
> with "a case of actual controversy." Id.
>
> The question of whether [the plaintiff] has alleged an abstract
> question not currently justiciable or an "actual controversy" proper
> for declaration is a matter of degree turning on the particular facts
> before the court. Babbitt v. United Farm Workers National Union,
> 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).
> That question must be considered on a case-by-case basis, Muller
> v. Olin Mathieson Chemical Corp., 404 F.2d 501, 504 (2d
> Cir.1968), deciding whether "the facts alleged, under all the
> circumstances, show there is a substantial controversy, between
> parties having adverse legal interests, of sufficient immediacy and
> reality to warrant the issuance of a declaratory judgment."
> Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270,
> 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Channel One Systems, Inc. v. Connecticut Dept. of Public Utility Control, 639 F. Supp. 188, 197

(D. Conn. 1986).

3.      "Federal courts do not render advisory opinions, even with the consent of the

parties. United States v. Johnson, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943). "The risk

of abuse is especially strong when the relief requested is a declaratory judgment, and this court

must therefore be especially careful to assure itself of the existence of an actual, continuing

controversy between the named plaintiff and the defendants." LaBonte v. Gates, 406 F. Supp.

1227, 1230 (D. Conn. 1976) (citing Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S.

270, 273 (1941)).

4.      In a different situation, when a potential infringer seeks a declaratory judgment

that its action does not constitute a copyright violation, the courts employ a "pragmatic two-part

test" to determine whether the statutory and constitutional justiciability requirements are met.

See Matthew Bender & Co. v. West Publishing Co., Nos. 94 Civ. 0589 (JSM), 95 Civ. 4496

(JSM), 1996 WL 223917 (S.D.N.Y. May 2, 1996).  There must be (1) an explicit threat or other

action by the copyright holder that creates a reasonable apprehension on the part of the

declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.  Id. (quoting BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed. Cir. 1993).  Even were a similar analogous rule applied to the instant situation, Ms. Wrobleski's conduct would not warrant declaratory relief.  There is no basis upon which the Court can conclude that Ms. Wrobleski has undertaken any potentially infringing present activity or has the intent to do so. Even were the Court permitted to engage in advisory rulings, it simply would be impractical for the Court to attempt to define the parameters of what Ms. Wrobleski can and cannot do with respect to the structured settlement industry and the Plaintiffs' intellectual property when Ms. Wrobleski herself has not even defined the parameters of what she might do in the future.

5.      There is no support for the Plaintiffs' contention that Ms. Wrobleski still physically possesses any intellectual property owned by the Plaintiffs, and there therefore is no case or controversy warranting adjudication with respect to the ownership of such non-existent property.


**TWENTY-FIRST COUNT - TORTUOUS [sic] INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP**

FINDINGS OF FACT:

1.      The Plaintiffs' relationship with Dr. Wang was at-will.  Dr. Wang worked as an at-will independent contractor, and both he and the Plaintiffs were entitled to terminate the relationship at any time.  (Wang testimony).

2.      The Plaintiffs' relationship with Dr. Wang was not a beneficial relationship.  To the contrary, the Plaintiffs have steadfastly claimed that their relationship with Dr. Wang caused them harm, having sued Dr. Wang and asserted numerous claims against him.  See Original and Amended Verified Complaint.  Thus, the Plaintiffs did not value this relationship and believed its existence harmed them, not benefitted them.  (Wang testimony, Darer testimony,

36

Correspondence between counsel).

3.        In fact, the Plaintiffs' damages expert contends that, during the time that Dr. Wang was employed by the Plaintiffs and during which time the Plaintiffs allegedly were "benefitting" from his services, they paid him directly and indirectly a total of $38,658.  Of this amount, the Plaintiffs assert that they overpaid Dr. Wang by $21,452.  See Expert Report of Richard J. Gering, p. 12.  The Plaintiffs engage in extreme hypocrisy when they allege Ms. Wrobleski interfered with a beneficial relationship with Dr. Wang at the same time that they simultaneously claim that their relationship with Dr. Wang had a negative value, contending that over 50% of the amounts paid for his services was wasteful.  (Wang testimony, Darer testimony).

4.        Ms. Wrobleski did not intend to interfere with the relationship between Dr. Wang and the Plaintiffs.  To the contrary, she was engaged by the Plaintiffs to interface between Dr. Wang, a programmer with little business expertise, and John Darer, a businessman with no programming experience or knowledge.  (Wang testimony, Darer testimony).

5.        Ms. Wrobleski's actions in assisting Dr. Wang and the Plaintiffs deal with each other were undertaken with the intent and goal of benefitting the Plaintiffs.  (Wang testimony, Darer testimony).

6.        The Plaintiffs have not suffered any damages resulting from Ms. Wrobleski's alleged tortious interference.  The Plaintiffs have not proved that they in any way were harmed by terminating Dr. Wang and retaining their new computer consultants.  (Wang testimony, Darer testimony, Michael Brevort testimony).

7.        The Plaintiffs have not offered any proof that the hourly rate charged by Dr. Wang was below market or otherwise advantageous to them.  To the contrary, Dr. Wang could be, and was, replaced by someone of sufficient skill to perform the programming tasks assigned by the Plaintiffs.  (Wang testimony, Michael Brevort testimony, Darer testimony, Correspondence between counsel).

8.      The fracture in the relationship between the Plaintiffs and Dr. Wang was not caused by Ms. Wrobleski, but rather by the Plaintiffs' insistence that Dr. Wang sign a non-compete agreement.  (Darer testimony, Wang testimony, draft work made for hire agreement).

9.      The fracture in the relationship between the Plaintiffs and Dr. Wang was not caused by Ms. Wrobleski, but rather by the Plaintiffs' refusal and failure to compensate Dr. Wang for all sums due to him for time he expended.

10.     The fracture in the relationship between the Plaintiffs and Dr. Wang was not caused by Ms. Wrobleski, but rather by the Plaintiffs' unilateral termination of Dr. Wang and their subsequent decision to sue him.  (Darer testimony, Wang testimony, Correspondence between parties).

11.     Ms. Wrobleski did not commit any tort (fraud, misrepresentation, intimidation, molestation, malicious action or otherwise) that interfered with the Plaintiffs' relationship with Dr. Wang.

12.     Ms. Wrobleski's activities with respect to the relationship between the Plaintiffs and Dr. Wang involved her good faith attempts to assist the two in working together to further the Plaintiffs' goals.  Ms. Wrobleski's activities were not motivated by malice, ill will or a desire to intentionally interfere with the relationship between the Plaintiffs and Dr. Wang.  (Wang testimony, Darer testimony).

13.     Ms. Wrobleski's conduct with respect to the relationship between the Plaintiffs and Dr. Wang was that of Dr. Wang's supervisor and colleague.  Her conduct in performing the task assigned to her by the Plaintiffs of interfacing between them and Dr. Wang was not improper.  (Darer testimony, Wang testimony).

14.     Ms. Wrobleski committed no tort with respect to interfering with the relationship between Dr. Wang and the Plaintiffs.  (Wang testimony, Darer testimony).

15.     At all relevant times before the Plaintiffs terminated their relationship with Dr. Wang, Ms. Wrobleski was an agent of the Plaintiffs.  (Wang testimony, Darer testimony).

38

16.    At all relevant times before the Plaintiffs terminated their relationship with Ms. Wrobleski, she endeavored to assist the Plaintiffs in their business objectives.  During said time period, Ms. Wrobleski's objectives, intent and conduct never were motivated by personal or outside interests.  Ms. Wrobleski's challenged conduct, alleged to be tortious interference, was legitimate action within the scope of her authority as a consultant employed by the Plaintiffs. (Darer testimony, Wang testimony).

17.    Ms. Wrobleski's challenged conduct, alleged to be tortious interference, was taken at the direction of, and with the knowledge of, John Darer.  (Darer testimony, Wang testimony).

18.    Ms. Wrobleski's challenged conduct, alleged to be tortious interference, was not taken solely or partially for her own benefit, but rather was always taken exclusively for the benefit of the Plaintiffs.  (Darer tesitmony, Wang testimony).


CONCLUSIONS OF LAW:

1.    "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."  Appleton v. Board of Education, 254 Conn. 205, 212-13 (2000) (internal quotation marks omitted).

2.    The Plaintiffs did not have a contractually enforceable or beneficial relationship with Dr. Wang.

3.    The Plaintiffs are judicially estopped from claiming that they had a beneficial relationship with Dr. Wang, having pled to the contrary in the two complaints they have filed in this action.  Indeed, the Plaintiffs have settled their dispute with Dr. Wang premised upon the

claims pled in those complaint, and such settlement, for which Dr. Wang provided

compensation, is wholly inconsistent with any claim that the Plaintiffs enjoyed a beneficial

relationship with him.

4.      To establish that a defendant's contractual interference was tortious requires proof

that the defendant was guilty of fraud, misrepresentation, intimidation, molestation or acted

maliciously.  Blake v. Levy, 191 Conn. 257, 261 (1983).

5.      Whether conduct that interferes with a business relationship is improper depends

on a variety of factors, which are enumerated in Section 767 of the Restatement (Second) of

Torts:

> In determining whether an actor's conduct in intentionally
> interfering with a contract or a prospective relation of another is
> improper or not, consideration is given to the following factors:
> (1) the nature of the actor's conduct, (b) the actor's motive, (c) the
> interests of the other with which the actor's conduct interferes, (d)
> the interests sought to be advanced by the actor, (e) the social
> interests in protecting the freedom of action of the actor and the
> contractual interests of the other, (f) the proximity or remoteness of
> the actor's conduct to the interference and (g) the relations
> between the parties.

Swift v. Ball, No. CV010344047S, 2003 WL 22413406 at *3 n.1 (Conn. Super. Oct. 6, 2003)

(citing Blake v. Levy, 191 Conn. 262-63 n.3).

6.      "The plaintiff need not prove that the defendant caused the breach of an actual

contract; proof of interference with even an unenforceable promise enough."  Suffield

Development Associates Ltd. Partnership v. National Loan Investors, L.P., 64 Conn. App. 192,

204 (2001), aff'd in part, rev'd in part on other grounds, 260 Conn. 766 (2002).  Nonetheless,

proof is required either of a contractual relationship or a beneficial relationship.[2]  Id.

7.      "It is also true, however, that not every act that disturbs a contract or business

---

[2]  At-will employment may not be a sufficient relationship to support a tortious
interference with a contractual relationship.  See McManus v. MCI Communications Corp., 748
A.2d 949, 957 (D.C. 2000), cert. denied, 531 U.S. 1183 (2001).  It would appear, however, that
at-will employment might constitute an advantageous business relationship sufficient to support
a tortious interference claim under Connecticut law.

expectancy is actionable." <u>Kent Literary Club of Wesleyan University v. Whaley</u>, No. CV0404104195S, 2004 WL 2361686 at *4 (Conn. Super. Sept. 16, 2004) (<u>citing Blake v. Levy</u>, 191 Conn. at 260); <u>see also Nemeth/Martin Consulting, Inc. v. Excel Data Systems, Inc.</u>, No. CV010076178S, 2003 WL 294613 at *2 (Conn. Super. Jan. 30, 2003).   "A defendant is guilty of tortious interference if he has engaged in improper conduct.  The plaintiff is required to plead and prove at least some improper motive or improper means." <u>Id</u>. (citations omitted).  Therefore, a "claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." <u>AAAA Legal Services, P.C. v. Illinois Union Insurance Co.</u>, No. X06CV030181773S, 2004 WL 1156547 at *2 (Conn. Super. May 13, 2004) (<u>quoting Downes-Patterson Corp. v. First Nat. Supermarkets</u>, 64 Conn. App. 417, 429, <u>cert. granted</u>, 258 Conn. 917 (2001) (appeal dismissed June 25, 2002).  "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort ..." <u>Biro v. Hirsch</u>, 62 Conn App. 11, 21-22, <u>cert. denied</u>, 256 Conn. 908, (2001) (citations omitted).  Ms. Wrobleski committed no tort or other improper action with respect to the relationship between the Plaintiffs and Dr. Wang.

    8.    "The general rule is that the agent may not be charged with having interfered with a contract of the agent's principal." <u>Selby v. Pelletier</u>, 1 Conn. App. 327, 327 n.4 (1984).  "Only if the agent is not acting within his powers, and in effect becomes an outsider, would it be fair to conclude that he is capable of interference ..." <u>Fredsall v. Remax Advantage, LLC</u>, 2004 WL 1098503 at *4 (Conn. Super. April 26, 2004) (<u>quoting Longley v. Suffield Academy</u>, No. CV 01 0809999, 2004 WL 728554 (Conn. Super. March 17, 2004)).

    9.    "An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable for breaching its own contract." <u>Weeks v. Office of Urban Affairs</u>, No. CV920339298, 1994 WL

516561 (Conn. Super. Sept. 12, 1994) (quoting Murray v. Bridgeport Hospital, 40 Conn. Supp. 56, 60-61 (1984)) (as a matter of law, agents of a party are unable to tortious interfere with a contract to which, as agents, they were parties); cf. Johnson v. City of Bridgeport, No. CV95321129, 1999 WL 391344 at *7 (Conn. Super. June 3, 1999) (if employees act with personal motivation and animus and, therefore, beyond the scope of their duties, a tortious interference claim "might" lie). "It is well settled that "corporate agents are not liable for tortuous [sic] interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." Downriver Development, LLC v. City of Trenton, No. 228353, 2002 WL 864380 (Mich. App. May 3, 2002) (quoting Reed v. Michigan Metrol Girl Scout Council, 201 Mich. App. 10, 13 (1993)). Ms. Wrobeski was at all times acting within the scope of her agency with the Plaintiffs and, therefore, cannot as a matter of law be held liable for interfering in a relationship between the Plaintiffs and Dr. Wang.

10.    "[T]here can be no tortious interference of a contract by someone who is directly or indirectly a party to the contract." Baum v. United Cable Television, 2 Conn. L. Rptr. 515, No. CV900044673S, 1992 WL 175119 (Conn. Super. July 20, 1992); Nemeth v. Gun Rack, LTD, No. 0601353, 1992 WL 315995 (Conn. Super. Sept. 21, 1992), aff'd, 33 Conn. App. 909 (1993); Lenart v. City Clerk of Derby, 2 Conn. L. Rptr. 630, 631, No. CV89028714S, 1990 WL 283768 (Conn. Super. Oct. 24, 1990). Ms. Wrobleski, as the Plaintiffs' agent, was involved in the hiring and firing of Dr. Wang. Dr. Wang was retained to assist Ms. Wrobleski in the development of the Plaintiffs' website, and she therefore indirectly was a party to the contract.

11.    There is no evidence that any alleged interference with the relationship with Dr. Wang and the Plaintiffs was done willfully or with improper motive so as to warrant an award of punitive damages.

42

## COUNTERCLAIMS

### FIRST COUNT - BREACH OF CONTRACT

FINDINGS OF FACT:

1.      Ms. Wrobleski holds a Bachelor of Arts degree in economics and a Masters of Business Administration degree in financial systems.

2.      For many years, Ms. Wrobleski and John Darer had been personal friends.  (Darer testimony).

3.      In or about January 2002, Darer and 4Structures (hereinafter, the "Counterclaim Defendants") engaged Ms. Wrobleski to provide software development services to one or both of them.  (Darer testimony).

4.      Pursuant to an oral consulting agreement between the Counterclaim Defendants and Ms. Wrobleski (the "Consulting Agreement), Ms. Wrobleski was to work as an independent contractor at the rate of $100 per hour.  (Darer testimony).

5.      In or about August 2002, the Counterclaim Defendants presented Ms. Wrobleski with an agreement which attempted, *inter alia*, to restrict her right to develop a website and/or software which "performed functions similar" to the functions performed by the website or software on which she worked for the Counterclaim Defendants and which attempted to preclude her from developing any software "for the purpose of managing, negotiating or settling legal claims" (the "Non-Compete").  (Darer testimony, Hayden Brainard testimony, correspondence between parties and counsel, draft work made for hire agreements).

6.      Ms. Wrobleski refused to sign the Non-Compete, which had a duration of two years, because she feared it would have seriously interfered with her ability to earn a livelihood.

7.      In an attempt to coerce Ms. Wrobleski to sign the Non-Compete, the Counterclaim Defendants threatened to, and did, withhold payments to which Ms. Wrobleski was entitled under the Consulting Agreement for work she had already performed.  (Darer testimony, Hayden Brainard testimony).

43

8.      The Counterclaim Defendants threatened to, and did, refuse to pay Ms. Wrobleski for her work during the months of July and August 2002, despite acknowledging that said sums were due her.  (Darer testimony, Wang testimony, Hayden Brainard testimony, correspondence between counsel and parties).

9.      As a result of the Counterclaim Defendants' breach of the Consulting Agreement, Ms. Wrobleski has been damaged in the amount of $12,125 for the unpaid July 2002 invoice and in the amount of $14,550 for the unpaid August 2002 invoice, totaling $26,675.  Ms. Wrobleski also is due $690 for software she purchased for the Counterclaim Defendants for which she never was paid.  (Darer testimony).

CONCLUSIONS OF LAW:

1.      "It is well established that the elements to form the basis of a breach of contract claim are that there was a formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  Rosato v. Mascardo, 82 Conn. App. 396, 411 (2004) (citations and internal quotation marks omitted).

2.      The Counterclaim Defendants breached the Consulting Agreement by withholding payment for services render by Ms. Wrobleski.

3.      As a result of said breach, Ms. Wrobleski has suffered the aforementioned damages.


**SECOND COUNT - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

FINDINGS OF FACT:

1.      Ms. Wrobleski incorporates the findings of fact set forth with respect to the first counterclaim.

CONCLUSIONS OF LAW:

1.      As the Connecticut Supreme Court has explained, "[e]very contract carries an

implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." <u>Gupta v. New Britain General Hospital</u>, 239 Conn. 574, 598 (1996).

2.　　In violation of the implied covenant of good faith and fair dealing, the Counterclaim Defendants refused to comply with their obligations unless and until Ms. Wrobleski signed the Non-Compete agreement.

3.　　As a result of said breach, Ms. Wrobleski has suffered the aforementioned damages, totaling $26,675 plus $690 for the software she purchased for the Counterclaim Defendants.

## THIRD COUNT - UNJUST ENRICHMENT

FINDINGS OF FACT:

1.　　Ms. Wrobleski incorporates the findings of fact set forth with respect to the first counterclaim.

2.　　The Counterclaim Defendants received a significant benefit by virtue of the consulting services which Ms. Wrobleski provided to them.  As a result of said services, the Counterclaim Defendants have made hundreds of thousands of dollars of income resulting from the competitive advantage they claim to enjoy by virtue of their website.  (Darer testimony, Darer tax returns, Wang testimony).

CONCLUSIONS OF LAW:

1.　　The elements of unjust enrichment are "that (1) the [Counterclaim Defendants were] benefitted, (2) the[y] unjustly failed to pay [Ms. Wrobleski] for the benefits, and (3) the failure of payment was to [Ms. Wrobleski's] detriment." <u>Gagne v. Vaccaro</u>, 255 Conn. 390, 409 (2001).

2.　　The Counterclaim Defendants have enjoyed, and continue to enjoy, a significant financial gain a result of Ms. Wrobleski's work on their website.

3.      The Counterclaim Defendants have unjustly refused to pay Ms. Wrobleski for her services, to her detriment.

4.      As a result of the Counterclaim Defendants' refusal to pay Ms. Wrobleski for her services, they have been unjustly enriched.

5.      A fair measure of the amounts by which the Counterclaim Defendants have been unjustly enriched is the contractual hourly rate of $100 per hour for Ms. Wrobleski's time, which was negotiated at arm's length by the parties prior to their dispute.  Therefore, Ms. Wrobleski is entitled to judgment on this claim in the amount of $26,675.  Ms. Wrobleski also is entitled to reimbursement of the $690 she spent purchasing software for the Counterclaim Defendants.


**FOURTH COUNT - QUANTUM MERUIT**

FINDINGS OF FACT:

1.      Ms. Wrobleski incorporates the findings of fact set forth with respect to all of the foregoing counterclaims.

2.      From in or about January 20002 through August 2002, Ms. Wrobleski rendered consulting services to the Counterclaim Defendants which were of significant value.  (Darer testimony)

3.      The Counterclaim Defendants knowingly accepted Ms. Wrobleski's services and compensated her for them for the first several months of their relationship.  (Darer testimony).

4.      The Counterclaim Defendants, both prior to, while and after Ms. Wrobleski rendered said services, promised Ms. Wrobleski that she would be compensated for them. Nonetheless, the Counterclaim Defendants have refused to compensated Ms. Wrobleski fully for the value of her services performed during the months of July and August 2002.  (Darer testimony).

5.      As the parties freely negotiated Ms. Wrobleski's compensation at a rate of $100 per hour, and as the Counterclaim Defendants willingly paid said hourly rate until other

46

considerations motivated them to cease such payments, a reasonable value of Ms. Wrobleski's computer consulting services is $100 per hour.  (Darer testimony).

CONCLUSIONS OF LAW:

1.      "The lack of a remedy under a contract is a precondition to recovery based on unjust enrichment or quantum meruit." United Coastal Industries, Inc. v. Clearheart Construction Co., 71 Conn.App. 506, 513 (2002).

2.      "Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact ... Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement." Gagne v. Vaccaro, 255 Conn. 390, 401 (2001) (citation omitted).

3.      To state a cause of action for quantum meruit "[t]he pleadings must allege facts to support the theory that [the Counterclaim Defendants], by knowingly accepting the services of the [Ms. Wrobleski] and representing to [her] that [she] would be compensated in the future, impliedly promised to pay [her] for the services [she] rendered." Burns v. Koellmer, 11 Conn.App. 375, 383-84 (1987).

4.      Were Ms. Wrobleski's contract unenforceable, she nonetheless still would be entitled to the amount of $26,675 in compensation for the 266.75 hours of services she rendered on behalf of the Plaintiffs for which she was not paid.


**FIFTH COUNT - INTENTIONAL MISREPRESENTATION**

FINDINGS OF FACT:

1.      Ms. Wrobleski incorporates the findings of fact set forth with respect to all of the foregoing counterclaims.

2.      Due to Ms. Wrobleski's relevant expertise and experience, as well as John Darer's experience with her during the years of free consulting services she had provided them, the Counterclaim Defendants believed that it was important for Ms. Wrobleski to work on their

47

website development.  (Darer testimony).

    3.      In order to induce Ms. Wrobleski to work with them, the Plaintiffs made numerous false representations concerning the terms and conditions of their business relationship.  (Darer testimony, Wang testimony).

    4.      The representations that were made by the Counterclaim Defendants in order to induce Ms. Wrobleski to work with them included the following:

        a.      That Ms. Wrobleski would initially work as a consultant at an hourly rate of $100 per hour, but that ultimately she would become John Darer's partner in developing and marketing the website and other software products that they would develop for the structured settlement industry;

        b.      That Ms. Wrobleski's compensation would not be dependent on her signing of any restrictive covenant or non-competition agreement;

        c.      That Ms. Wrobleski would be permitted to devote her time to working on the Counterclaim Defendants' website.  (Darer testimony, Wang testimony, correspondence between parties).

    5.      These representations were made to Ms. Wrobleski by the Plaintiffs at various times from November 2001 through January 2002, at which time Ms. Wrobleski accepted a paid engagement with the Plaintiffs.  (Darer testimony).

    6.      The Counterclaim Defendants' representations were known by them to be false when made, in that:

        a.      they never intended to pay Ms. Wrobleski for all of her services until and unless she signed a restrictive covenant and non-competition agreement that would preclude her from developing or marketing a software product for use in the structured settlement industry;

        b.      they never intended to offer Ms. Wrobleski a partnership or otherwise change the terms of her compensation in a way that would be beneficial to her; and

   c.     they always intended for Ms. Wrobleski to devote a significant portion of her time to attempting to develop factual support for a baseless fraud claim against Sybits and its principals.  (Darer testimony).

7.     In reliance on the Counterclaim Defendants' representations, Ms. Wrobleski agreed to become and remain a consultant to them and, as a result, has suffered damages which include, but are not limited to, the loss of payment for the months of July and August 2002, as well as emotional pain, suffering and mental anguish.  (Darer testimony).

CONCLUSIONS OF LAW:

1.     The elements of a claim for intentional misrepresentation or fraud are that:

> (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."

Parker v. Shaker Real Estate, Inc., 47 Conn. App. 489, 493 (1998).

2.     The Counterclaim Defendants are liable for intentional misrepresentation because they intentionally made false representations concerning their intentions with regard to Ms. Wrobleski's engagement with them, as statements of fact, and such misrepresentations induced Ms. Wrobleski to reasonably rely upon them to her detriment.

3.     The Counterclaim Defendants wilfull, wanton and reckless conduct warrants the imposition of punitive damages.

**SIXTH COUNT - NEGLIGENT MISREPRESENTATION**

FINDINGS OF FACT:

1.     Ms. Wrobleski incorporates the findings of fact set forth with respect to all of the foregoing counterclaims.

2.     The Plaintiffs made the aforementioned misrepresentations negligently, if not intentionally.  (Darer testimony).

CONCLUSIONS OF LAW:

1.    "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth ... The governing principles are set forth in similar terms in § 552 of the Restatement (Second) of Torts (1977): One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Craine v. Trinity College, 259 Conn. 625, 660-61 (2002) (internal quotation marks omitted).

2.    If the Counterclaim Defendants' aforementioned representations were not falsely made intentionally, the Counterclaim Defendants nonetheless still are liable because they should have known and had the duty of knowing the truth of their representations before making them.

3.    The Counterclaim Defendants failed to exercise reasonable care or competence in making their representations concerning the terms of Ms. Wrobleski's engagement and the potential for a future relationship.

4.    Ms. Wrobleski reasonably relied upon the Counterclaim Defendants' false representations, to her detriment.


**SEVENTH COUNT - VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA")**

FINDINGS OF FACT:

1.    The Counterclaim Defendants induced Ms. Wrobleski to enter into a business relationship with them by making the misrepresentations set forth above with respect to Ms. Wrobleski's other counterclaims.  (Darer testimony).

2.    Making similar misrepresentations, the Counterclaim Defendants induced Dr. Wang to enter into a business relationship with them.  (Darer testimony, Wang testimony).

3.      The Counterclaim Defendants and their counsel, Hayden Brainard, sought to enlist the support of Ms. Wrobleski and Dr. Wang in fabricating a fraud claim against a competitor, in an attempt to stifle competition from other software developers experienced in the structured settlement industry who might develop a product for a competitor.  In furtherance of said goal, the Counterclaim Defendants promised a percentage of the recovery on said fraud claim to Ms. Wrobleski and Dr. Wang.  (Darer testimony, Wang testimony, Hayden Brainard testimony).

4.      At the Counterclaim Defendants' request, Ms. Wrobleski and Dr. Wang spent numerous hours investigating a potential fraud claim, and the Counterclaim Defendants expended significant legal fees with respect to the same goal – to commence a second lawsuit against Sybits, a computer consulting company with expertise in the financial and structured settlement industry that had just concluded development work for the Counterclaim Defendants. Ultimately, despite extreme pressure from the Counterclaim Defendants, Ms. Wrobeski and Dr. Wang would not support the Counterclaim Defendants in their false accusations.  (Darer testimony, Wang testimony, Hayden Brainard testimony).

5.      Only after Ms. Wrobleski and Dr. Wang had performed substantial services for the Counterclaim Defendants and after the Counterclaim Defendants owed them significant amounts for services already rendered did the Counterclaim Defendants attempt to coerce Ms. Wrobleski and Dr. Wang into signing a restrictive covenant with respect to their future engagements by threatening to withhold payments if they refused to sign such an agreement. (Darer testimony, Wang testimony).

6.      In spite of such threats, Ms. Wrobleski and Dr. Wang refused to sign a non-compete agreement restricting their ability to develop other software in the future for structured settlements or legal claim settlements.  As a result, the Counterclaim Defendants carried out their threat, refusing to pay Ms. Wrobleski and Dr. Wang for services already performed.  (Darer testimony, Wang testimony, Hayden Brainard testimony).

7.    The Counterclaim Defendants' conduct was motivated by an intention to stifle competition by endeavoring to obtain a non-compete agreement from Ms. Wrobleski and Dr. Wang through the coercion of threatening to withhold sums already earned by them and then actually withholding said sums. (Darer testimony, Wang testimony, draft work made for hire agreements).

8.    The Counterclaim Defendants were aware that Ms. Wrobleski and Dr. Wang would not have signed a non-compete agreement at the commencement of their relationship with the Counterclaim Defendants, as both were independent contractors and were authorized to perform development and other work for other clients even during their engagement with the Counterclaim Defendants. Only after the Counterclaim Defendants believed that they had sufficient leverage over Ms. Wrobleski and Dr. Wang did they demand the signing of a non-compete as a condition for payment or any future relationship. (Darer testimony, Wang testimony).

9.    When Ms. Wrobleski and Dr. Wang continued their refusal to sign an agreement restricting their ability to develop other software in the industry, the Counterclaim Defendants commenced baseless litigation against them, all the time continuing to seek a non-compete agreement in exchange for a withdrawal of their claims. (Darer testimony, Wang testimony).

10.    The Counterclaim Defendants denied payment to Ms. Wrobleski and Dr. Wang and then commenced suit against them for the purpose of discouraging them from pursuing their announced intention of developing a competing product or otherwise working in the industry. The Counterclaim Defendants' actions also were intended to, and did, discourage another software developer in the industry and another potential employer for Ms. Wrobleski, Viren Patel, from engaging Ms. Wrobleski, for fear of becoming involved in a lawsuit and being sued by the Counterclaim Defendants. (Darer testimony, Wang testimony, Viren Patel deposition or testimony, correspondence between counsel).

11.    As a result of the Counterclaim Defendants' commencement of this action, Dr.

Wang and Ms. Wrobleski terminated their plans to jointly develop another product for the structured settlement industry, fearful that it would be uneconomical to develop such a product and have to defend themselves against the Counterclaim Defendants' claim that they possessed as a proprietary trade secret almost all information concerning the industry.  The Counterclaim Defendants further claimed, without legal basis, a copyright or other intellectual property protection over all aspects of the functionality of any software to service the structured settlement industry.  (Darer testimony, Hayden Brainard testimony, Wang testimony, Viren Patel testimony).

12.     The instant action is the fourth litigation which the Counterclaim Defendants have commenced since the year 2001 against software developers who were unfortunate enough to have worked on the development of the Plaintiffs' website.  (Darer testimony, Greg Bush testimony, complaints from former lawsuits).

13.     Each of the three prior litigations was commenced against parties whom the Counterclaim Defendants knew could not afford the costs of defense.  (Darer testimony).

14.     In 2001, John Darer hired a company, Fresh Baked Studios, partly owned by his sister, to develop his website.  Although the written contract between the Counterclaim Defendant John Darer and Fresh Baked Studios provided that Fresh Baked Studios was to develop only a marketing type "front end" brochure-ware website, Counterclaim Defendant Darer claimed that Fresh Baked Studios subsequently orally promised to develop an entire "back end" database for the functioning of his business for the same, single payment of $15,000.  (Darer testimony, Fresh Baked Studios agreement, Fresh Baked Studios complaint).

15.     John Darer was dissatisfied with the work of Fresh Baked Studios, and he terminated his relationship with it.  Darer thereafter commenced suit, alleging:  breach of contract, breach of oral contract, promissory estoppel, breach of implied warranty of fitness for a particular purpose, tortious interference with business expectancy, negligence, conversion, intentional infliction of emotional distress, and a violation of CUTPA.  (Darer testimony, Fresh

Baked Studios complaint).

16.     When it became apparent that Fresh Baked Studios could not afford to defend the lawsuit and continue its operations, the Counterclaim Defendant Darer amended his complaint to seek to pierce the corporate veil and hold, *inter alia*, John Darer's sister personally liable. During the course of the litigation, Fresh Baked Studios went out of business.  (Darer testimony, Fresh Baked Studios complaint).

17.     The Fresh Baked Studios lawsuit was settled for a nominal payment of $15,000 by one of the defendants to John Darer.  Darer incurred substantial amount of attorney's fees to recover that $15,000 payment, although he successfully accomplished their goal of eliminating a software development company that might develop websites for competitors.  (Darer testimony).

18.     Thereafter, the Counterclaim Defendants retained the services of Greg Bush to convert the website developed by Fresh Baked Studios to a different software platform and to perform additional development work.  The Counterclaim Defendants paid Greg Bush approximately $15,000 for his part-time "moonlighting" work while he was employed full-time at Isolve.com.  (Darer testimony, Greg Bush complaint, Greg Bush testimony).

19.     The scope of the project kept on expanding because of the Counterclaim Defendants' repeated new requirements, and Greg Bush ultimately requested to have another full-time development company complete the development of his work because it became too extensive a project for a single individual to perform part-time.  (Darer testimony, Greg Bush testimony, correspondence between Greg Bush, John Darer, and/or Mary Wrobleski).

20.     The Counterclaim Defendants thereafter retained the services of Sybits, then Ms. Wrobleski's employer.  (Darer testimony, Greg Bush testimony, Sybits complaint).

21.     The Counterclaim Defendants then commenced suit against Greg Bush, alleging breach of contract, promissory estoppel, breach of implied warranty of fitness for a particular purpose, tortious interference with business expectancy, negligence, and intentional infliction of emotional distress.  (Darer testimony, Greg Bush testimony, Sybits complaint).

22.     Although strongly believing that this lawsuit was frivolous and vindictive, Greg Bush settled the lawsuit with the Counterclaim Defendants for $4,000.  The Counterclaim Defendants admit to having paid $23,000 in attorneys' fees in their pursuit of that claim.  (Darer testimony, Greg Bush testimony, Greg Bush settlement agreement).

23.     In June 2001, the Counterclaim Defendants thereafter hired an established software development company, Sybits, to continue development of its website.  The Counterclaim Defendants paid Sybits $168,072.60 to develop their website, in stark contrast to the $15,000 that had been paid to the prior developers for the same project.  Sybits successfully developed a functional website that "went live" on or about August 15, 2001.  Yet again discontent with the services performed and fees it had paid, the Counterclaim Defendants terminated their relationship with Sybits and commenced suit against it.  (Darer testimony, Detail Information Regarding Claims for Damages, Sybits complaint).

24.     The Sybits lawsuit also named Ms. Wrobleski, as an employee of Sybits, because of a dispute over the property she held on her personal computer. (Darer testimony, Sybits complaint).

25.     The Sybits lawsuit alleged claims for copyright infringement, breach of contract, unfair competition, false designation of origin and false representation, trademark dilution, trademark infringement, unfair competition, misappropriation, computer fraud (Conn. Gen. Stat. § 52-570b), violation of Conn. Gen. Stat. § 35-11a, violation of Connecticut Uniform Trade Secrets Act, unjust enrichment, violation of CUTPA, breach of fiduciary duties, fraud, negligent misrepresentation, statutory theft (Conn Gen. Stat. § 52-564), conversion, declaratory judgment, and breach of duty of good faith and fair dealing.  (Sybits complaint).

26.     The Sybits lawsuit was resolved without the payment of any money.  The Counterclaim Defendants used the litigation process, however, to extract certain concessions from Sybits, including an agreement that Sybits would not develop or sell technology to the structured settlement industry for 28 months, a result they could not have accomplished even had

they been successful at trial on each of their claims.  (Sybits settlement agreement).

27.    Shortly after the settlement documents were signed, the Counterclaim Defendants prepared to sue Sybits and its principals again on the grounds that the settlement was procured by fraud.  This second Sybits lawsuit was never commenced because, as discussed above, Ms. Wrobleski and Dr. Wang refused to support the Counterclaim Defendants' claim.  (Wang testimony, Darer testimony, Hayden Brainard testimony).

28.    The first complaint in the instant matter asserted claims that were virtually identical to the claims brought against Sybits.  In both lawsuits, the Counterclaim Defendants claimed that others were attempting to utilize their trade secrets and confidential information. As discussed above, the Counterclaim Defendants maintain a grossly exaggerated belief as to the extent of their "intellectual property," and they have consistently asserted this belief in litigation in order to thwart or prevent competition.  (Verified complaint, Sybits complaint, Darer testimony).

29.    The Counterclaim Defendants utilized their lawsuits against Greg Bush and Sybits to obtain from their adversaries contractual agreement that they are entitled to claim as proprietary intellectual property information, processes and ideas that are not subject to protection under established copyright, patent or trade secret law.  (Darer testimony, Greg Bush settlement agreement, Sybits settlement agreement).

30.    The Counterclaim Defendants engaged in further anti-competitive conduct by threatening, and ultimately commencing, baseless litigation against Ms. Wrobleski and Dr. Wang, as well as the other actual or perceived competitors, with the intent of stifling competition. (Darer testimony, Wang testimony).

31.    As a result of the Counterclaim Defendants' unlawful conduct in attempting to stifle Ms. Wrobleski's competition and in endeavoring to "punish" her: (1) because of her refusal to perjure herself in order to support a second Sybits litigation and (2) because of her exercise of her right to refuse to sign a non-compete agreement, Ms. Wrobleski has suffered substantial

56

injury and an ascertainable loss. Ms. Wrobleski has been forced to incur thousands of dollars of attorneys' fees as a result of the Counterclaim Defendants' unlawful conduct. Ms. Wrobleski also have suffered emotional pain, suffering, mental anguish, and diminution in the enjoyment of her life. (Wang testimony, Darer testimony, attorneys' fees bills or other accounting records).

32.     During the course of this litigation, the Counterclaim Defendants repeatedly have sought non-compete agreements from Ms. Wrobleski and Dr. Wang as a condition to settlement, although such a restrictive covenant could not be ordered by this Court even were it to find in favor of the Counterclaim Defendants on each count of their complaint. (Wang testimony, Darer testimony, Hayden Brainard testimony).

33.     Counterclaim Defendant John Darer specifically instructed Dr. Wang that he was unwilling to settle this litigation against him unless Dr. Wang terminated his relationship with his then counsel, Steven Frederick. (Wang testimony, Darer testimony).

34.     After Dr. Wang terminated his counsel, the Counterclaim Defendants encouraged Dr. Wang to testify falsely against Ms. Wrobleski as part of a settlement agreement. (Wang testimony, Darer testimony).

35.     Upon information and belief, the Counterclaim Defendants and Dr. Wang have settled their dispute through the exchange of a nominal payment and a lengthy covenant not to compete. (Wang testimony, Darer testimony, Wang settlement agreement).

36.     The Plaintiffs' conduct is oppressive and unscrupulous because it is designed and intended to subject Ms. Wrobleski to the expense of hiring counsel to overcome their anti-competitive efforts to harm and/or destroy her professionally and personally. (Wang testimony, Darer testimony).

37.     Ms. Wrobleski has suffered a financial loss because of the Plaintiffs' improper conduct that includes, without limitation, the incurrence of thousands of dollars of attorneys' fees and the loss of potential business opportunities that she would and could have pursued but for the Plaintiffs' misconduct. (Wang testimony, attorneys' fees bills or other accounting

records).

38.     Shortly before the trial of this matter, in submitting the parties' joint trial memorandum, the Plaintiffs for the first time announced an intention to abandon eight of the twenty-one counts brought against Ms. Wrobleski.

CONCLUSIONS OF LAW:

1.     "The policy behind CUTPA is to encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices ." Suarez v. Sordo, 43 Conn.App. 756, 772 (1996) (internal quotation marks omitted), cert. denied, 240 Conn. 906 (1997). "[B]ecause CUTPA is a self-avowed remedial measure ... it is construed liberally in an effort to effectuate its public policy goals." Associated Investment Co. Ltd. Partnership v. Williams Associates IV, 230 Conn. 148, 158 (1994) (internal quotation marks omitted).

2.     The Connecticut General Assembly "deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." Id. at 157 "It is clear that CUTPA has come to embrace a much broader range of business conduct than does the common law tort action." Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 507 (1995). In fact, "CUTPA violations do not necessarily have to be based on an underlying actionable wrong ..." Hartford Electric Supply Co. v. Allen Bradley Co., 250 Conn. 334, 369 (1999).

3.     "It is well settled that in determining whether a practice violates CUTPA [the Connecticut Supreme Court has] adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria do not need to

58

be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id. at 367-68.

4.    The Counterclaim Defendants' conduct constituting a CUTPA violation includes their abuse of process.  "An action for abuse of process lies against any person using 'a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." Varga v. Pareles, 137 Conn. 663, 667 (1951).  "Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of 'a legal process ... against another *primarily* to accomplish a purpose for which it is not designed ...." Norse Systems, Inc. v. Tingley Systems, Inc., 49 Conn. App. 582, 600 (1998).

5.    The Counterclaim Defendants' conduct was unethical, oppressive, unscrupulous, and constituted an unfair practice in the conduct of trade, business, or commerce.

6.    The Counterclaim Defendants have demonstrated a reckless indifference to Ms. Wrobleski's rights and an intentional and wanton violation of those rights.

7.    The Counterclaim Defendants' conduct violates the established Connecticut policy of free competition in the market, as well as the established Connecticut policy of not restraining an employee's right to change employers without retribution.

8.    Connecticut law recognizes a viable counterclaim for violation of the Connecticut Unfair Trade Practice Act ("CUTPA") when a Plaintiff commences an action under the guise of attempting to protect trade secrets when the litigation in reality is an attempt to harm or destroy a party's business interests or prospects in order to avoid competition.  See Classic Limousine v. Alliance Limousine LLC, No. CV990174911S, 2002 WL 31050919 (Conn. Super. Aug. 13, 2002); see also TCW Realty Fund II v. Pearle Vision, Inc., No. CVH-4990HD, 1996 WL 636347 (Conn. Super. Oct. 29, 1996) (allegations that plaintiff persisted with groundless lawsuit and that lawsuit was pursued for an ulterior purpose constituting abuse of process was sufficient to state

CUPTA claim); cf. New England Mortgage Group, Inc. v. Lebowitz, No. CV970160827, 2001 WL 951330 at *2 (Conn. Super. July 20, 2001) (allegation in counterclaim that the present action was brought "for the purpose of unfairly seeking to stifle competition in the marketplace" stated counterclaim for abuse of process).

9.    It would be speculative to award compensatory damages for the harm the Counterclaim Defendants have caused that prevented Ms. Wrobleski from competing with them in the structured settlement industry since the commencement of this litigation, as said harm resulted in Ms. Wrobleski never even commencing more than the preliminary stages of business development.  In such a case, punitive damages are all the more appropriate under CUTPA so as to deter similar conduct in the future.

10.    As a result of the Plaintiffs' violations of CUTPA, Ms. Wrobleski is entitled to an award of costs and reasonable attorneys' fees, in addition to punitive damages.  See Conn. Gen. Stat. § 42-110g.